## No. 2494.

## Clay Taylor *v.* The State.

1. Theft—Charge of the Court.—A conviction for theft by means of false pretext may be had under an indictment charging theft in usual form. The evidence in this case shows that the accused acquired the possession of the alleged stolen horses with the consent of the owner, under a contract of hiring. Under this proof the trial judge charged the jury upon theft by means of false pretext as defined by article 727 of the Penal Code, and also theft as defined by the act of March 8, 1887, i. e., fraudulent conversion of property without the consent of the owner,

when said property has been obtained from the owner by virtue of a contract of bailment. *Held*, that the proof authorized the charge first mentioned, but that the same was insufficient inasmuch as it failed to instruct the jury explicitly that the fraudulent intent on the part of the accused must have existed at the very time he obtained possession of the property, and that no subsequent fraudulent intent would constitute theft.

2. SAME.—The constituent elements of the species of theft defined by the said act of March 8, 1887, are essentially different from those of theft in general, and from theft by means of false pretext, inasmuch as, to constitute the theft denounced by the said act of March 8, 1887, the fraudulent intent refers to and must concur with the act of *conversion*, and need not exist at the time of obtaining the possession of the property. Proof, therefore, which would support a conviction for the theft defined by the said act of March 8, 1887, would not authorize a conviction for theft under an indictment for general theft; and inasmuch as the indictment was in general form, the charge of the court upon the theft defined by the said act of March 8, 1887, was unwarranted and erroneous. See the opinion *in extenso* for an elucidation of the principle.

APPEAL from the District Court of Mitchell. Tried below before the Hon. William Kennedy.

The indictment in this case charged the appellant, in the ordinary form, with the theft of two horses, the property of G. H. Colvin, in Mitchell county, Texas, on the twenty-sixth day of July, 1887. The trial resulted in the conviction of the defendant, and the penalty was assessed at a term of four years in the State penitentiary.

G. H. Colvin was the first witness for the State. He testified, in substance, that he lived in Colorado, Mitchell county, Texas, and on the twenty-sixth day of July, 1887, was engaged in the livery stable business. On the morning of the said July 26, the defendant came to the witness's stable and told him that he wanted a buggy and a pair of horses to drive up the road in the direction of Snyder, in Scurry county, his purpose being to meet some of his friends who were on that road, en route to Colorado, and who were due in Colorado on the night before. He also told witness that he had been informed that his friends expected to camp on the night before about six miles out from Snyder, and that, if he did not meet them nearer, he expected to go on to their camp; that he could not make that trip and get back before ten o'clock that night; and that, if witness would not charge him any more, he would prefer to put up the team and drive into Colorado early on the next morning. Witness replied that such

arrangement would make the drive easier on the team, and that he would not charge defendant extra for keeping the team over night and coming in early on the next morning. Witness then, by request of defendant, caused a pair of blankets and some feed to be placed in the buggy, the same to be used by the defendant for the comfort of himself and the horses.

Upon the representations so made by the defendant, which the witness believed and relied upon, he let the defendant have the buggy and two horses to go up the Snyder road to the camp within six miles of Snyder, and no where else, and to keep the buggy and team until early on the next morning and no longer; and it was upon the said representations of the defendant alone that witness was induced to part with the possession of his buggy and horses. Defendant failing to return to Colorado on the next morning, according to his contract, the witness made and caused inquiries to be made for him and the buggy and team, and failing to hear from them, he telegraphed to the officers of the various surrounding counties. On or about August 2, 1887, the witness was notified that the defendant was in jail at Pecos, in Reeves county. Witness then went to Pecos, identified the defendant, and brought the buggy and team back to Colorado. Sam Malin aws an equal partner with witness in the livery stable, but the entire business and property connected with that establishment were under the witness's exclusive care, management and control. Witness had, twice or thrice before the said July 26, 1887, hired his buggies and teams to defendant, who had always returned them according to contract.

Jube Johnson testified, for the State, that he lived in Colorado, Mitchell county, Texas, and that he was employed as a hand in Mr. Colvin's livery stable, in that county. On the evening of July 25, 1887, the defendant came to the stable and asked witness for Mr. Colvin. Witness told him that Mr. Colvin was out of town. Defendant then said that he wanted a buggy and team to go a few miles into the country. Witness told him that he would have to see Mr. Colvin about getting a buggy and team. Witness saw no more of the defendant until the next morning, when he got the buggy and team from Mr. Colvin. Witness heard defendant, when he got the outfit, tell Mr. Colvin that he wanted to go to meet some friends of his at a point about six miles from Snyder, on the Snyder and Colorado road. Witness heard the agreement between defendant and Colvin about the keeping the buggy and horses out over night and bringing them

back early on the next morning, and, as directed by Colvin, witness put a pair of blankets and some feed into the buggy. Witness never saw the defendant after that morning until this trial. He next saw the buggy and horses when Mr. Colvin brought them back to Colorado, eight or ten days after defendant took them off.

Manse Pink, another of the employes of Mr. Colvin, testified as did the witness Johnson with regard to the agreement entered into between the defendant and Colvin on the morning that the buggy and horses were delivered to defendant.

M. D. McWhorter testified, for the State, that he was the keeper of the toll bridge over the Pecos river, near the town of Pecos, in Pecos county. Defendant, riding in a buggy drawn by two horses, came to witness's bridge to cross the river, on the second or third day of August, 1887. A short time before the defendant came to the bridge, a deputy sheriff of Reeves county came to the bridge, going towards the town of Pecos, and told witness that if defendant, with the buggy and horses came to the bridge, to detain defendant in conversation until he could get back, as he had a telegram to arrest the defendant for the theft of the buggy and horses. Doctor Turney was then with the witness. Defendant soon afterwards drove up in the buggy, and, as directed by the deputy sheriff, the witness and Doctor Turney engaged him in conversation. Defendant took the horses from the buggy and led them down to the sand bar of the river to drink. Doctor Turney and witness examined the horses closely, and professed to admire them very much. Doctor Turney asked the defendant if he would sell them, and what he would take for them. Defendant replied that he did not care to sell them; that, in fact, he did not own them, but that they belonged to a friend whom he expected to meet in Pecos, and to whom he was going to deliver them. He said that the owner of the buggy and team lived at a place the name of which witness had forgotten. He remembered, however, that the place he mentioned was not Colorado. Defendant then asked witness if he could furnish him supper, and the witness, being anxious to detain him, replied that he could. He then said that he wanted supper in time to drive two and a half miles up the river, to a certain spring where he intended to camp for the night. He then proposed to take Doctor Turney in his buggy and drive up the road a short distance to show the movement of the horses, and said he would return in time for supper. Witness then stepped to his

house and ordered defendant's supper to be prepared, and had just turned back towards the bridge when he saw sheriff Turnbo and his deputy ride up to the buggy and arrest defendant. Doctor Turney then left the buggy and rejoined witness, and the sheriff took the defendant and the buggy and team on to Pecos. Witness's bridge was the only crossing of the Pecos river for many miles north or south of Pecos City. The nearest wagon crossing to the bridge was about sixty-five miles distant, and that was a private ranch crossing. Defendant was traveling west when he reached the bridge. A person unacquainted with the said private ranch crossing, and traveling west in a vehicle,. would be compelled to cross the Pecos river at witness's bridge.

R. C. Ware testified, for the State, that he lived in the town of Colorado, Texas, and was sheriff of Mitchell county. About the last of July, 1887, Mr. Colvin called upon witness to cause the arrest of the defendant for the theft from him of a buggy and pair of horses. Among the various sheriffs to whom witness telegraphed a description of the defendant and the buggy and horses, was Sheriff Turnbo, of Reeves county. On the second or third day of August, Sheriff Turnbo telegraphed witness that he had the defendant and the property. Witness went to Pecos City and received the defendant from the custody of Sheriff Turnbo.

The defense offered no evidence.

The motion for new trial raised the question discussed in the opinion.

No brief for appellant.

*W. L. Davidson*, Assistant Attorney General, for the State.

WILLSON, JUDGE. This conviction is under an indictment charging in the usual form the theft of two horses. The evidence shows that the defendant obtained possession of the horses. with the consent of the owner under a contract of hiring. In his charge to the jury the trial judge explained and submitted theft by means of false pretext, as defined by article 727 of the Penal Code, and also theft as defined by the act of March 8, 1887 (Willson's Crim. Stats., sec. 1292); that is, fraudulent conversion of property without the consent of the owner, where said property has been obtained from the owner by virtue of a contract

·of bailment.   These charges were excepted to at the time of the trial by the defendant.

With respect to the charge explaining theft by means of false pretext, it was warranted by the evidence, and it is well settled that under an indictment charging theft in the usual form a conviction may be had for theft by means of false pretext.   (Willson's Crim. Stats., sec. 1263.)   But the charge given by the court, while correct as far as it goes, falls short of the whole law upon the issue.   It does not directly and explicitly instruct that the fraudulent intent on the part of the defendant must have existed at the very time he obtained possession of the property, and that no subsequent fraudulent intent would constitute theft.   (Willson's Crim. Stats., sec. 1269.)   Special instructions supplying this ·deficiency in the charge were requested by the defendant, and the court erred in refusing to give them.

With respect to the charge explaining the theft defined by the act of March 8, 1887, supra, it was also warranted by the evidence.   It is contended, however, by counsel for defendant that under the indictment a conviction can not be had for this species of theft, and that therefore it was error to give such charge.   We are of the opinion that this position is a sound one.   This species of theft differs essentially from theft in general, and from theft by means of false pretext.   In this offense the possession of the property is obtained lawfully, by virtue of a contract, with or without a fraudulent intent on the part of the defendant at the time of obtaining the same.   The fraudulent intent required to constitute this offense relates to and must concur with the act of *conversion,* and need not exist at the time of obtaining possession of the property.   It is the *fraudulent conversion* and not the *fraudulent taking,* that forms the gist of this offense. Theft in general and theft by false pretext are not constituted unless the fraudulent intent exists at the very time of the taking. This offense is as essentially different from theft in general and theft by false pretext as is the offense of theft from the person, a conviction for which last named offense can not be maintained under an indictment charging theft in the usual form.   (Willson's Crim. Stats., secs. 1264, 1312.)

It has been held by a majority of this court that, under an indictment charging theft in the usual form, a conviction may be had for the offense defined by article 749 of the Penal Code, ·of "wilfully taking into possession and driving, etc., live stock," ·etc.   These decisions, however, are grounded upon the fact that

to constitute that offense there must be, as in theft in general, a fraudulent *taking* of the property, and that the constituent elements of the offense are the same as theft in general. (Willson's Crim. Stats., sec. 1263.) It has also been held that, under such an indictment, a conviction is maintainable for the misdemeanor defined by article 767 of the Penal Code. (Guest v. The State, 24 Texas Ct. App., 235, and cases there cited.) These decisions are based upon the ground that the offense defined by article 767 is not clearly distinguishable from ordinary theft. The decisions above referred to, with reference to the offenses defined by articles 749 and 767, are inapplicable, in our opinion, to the offense defined by the act of March 8, 1887, supra, for the reason before stated, that said last named offense is essentially different in its elements from the offense of ordinary theft. Nor does said offense come within the provision of subdivision 6 of article 714, Code of Criminal Procedure, because in said offense the acquisition of the property is not necessarily unlawful, but may be lawful, and it is only an *unlawful acquisition* of property that is embraced in said provision. This new offense is nothing more nor less than *embezzlement*, named and declared to be *theft*, and to warrant a conviction for it the indictment must charge specifically the facts constituting it—that is, the facts of the bailment and the fraudulent *conversion* of the property without the consent of the owner, etc. We hold that the court erred in instructing the jury that they might convict the defendant under the said new statute.

Because of the errors in the charge of the court which we have discussed, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*